UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:10-cr-706 |
| | § | |
| GEORGE WESLEY ELLINGTON, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Defendant George Wesley Ellington has brought a motion to suppress an incriminating written statement he provided to authorities while in the Federal Bureau of Investigation's ("FBI") custody on October 25, 2010. (Doc. No. 21.) The Court held an evidentiary hearing in which it heard testimony from Ellington, as well as Special Agent Christopher Horan of the FBI, and Sergeant Edison Toquica of the Harris County Sherriff's Department ("HCSD"). After considering the parties' arguments, the evidence presented, and the applicable law, the Court finds that Ellington's motion should be **GRANTED**.

I.      **BACKGROUND**

On October 14, 2010, a federal sealed indictment was filed charging Ellington, a HCSD Deputy Sheriff, with two (2) counts of "Extortion Under Color of Official Right" in violation of 18 U.S.C. § 1951(a). (Indictment, Doc. No. 1.) The indictment charges that Ellington, "in his law enforcement capacity, provided assistance to a Confidential Human Source (CHS1) in exchange for money for the purpose of facilitating what defendant believed were unlawful drug-trafficking activities." (*Id.*) Sometime before Ellington's indictment, officials from the FBI, HCSD, and the United States Attorney's Office convened a series of strategy meetings in which they discussed how best to confront Ellington with his alleged criminal activity. (Tr. 37:24-

1

38:5.)[1]  Over the course of several meetings, officials testified, they devised a plan that they claimed would give Ellington "an opportunity to provide assistance" to the government's investigation of other allegedly corrupt law enforcement officials.  (*Id*. at 38:6-11.)  As part of this plan, the United States Attorney's Office decided initially to seek Ellington's indictment on only two counts of extortion under 18 U.S.C. § 1951(a), even though it believed it possessed evidence demonstrating that he had committed four additional crimes.  (*Id*. at 38:12-25.)  Only charging the two extortion counts and sealing the indictment, Agent Horan testified, would give Ellington a "chance to cooperate."  (*Id*. at 38:22-23; 39:25-40:9.)

On October 25, 2010, Ellington was ordered by his superiors from HCSD to report to the regional FBI headquarters in Houston, Texas, in order to discuss the possibility of his participation in a newly established federal gang task force.  (GWE Tr. 4:5-5:23; Tr. 40:10-22.) Previously, Ellington had applied for a federal task force position and therefore did not suspect anything was afoot when he received these instructions.  (GWE Tr. 5:11-19.)  Ellington reported to the FBI headquarters as directed, arriving at the guard station at approximately 9:00 a.m. on October 25, 2010.  (GWE Tr. 5:24-6:16.)  He waited at the guard station until Special Agents Christopher Horan and Steven Dillon met him and escorted him inside the building.  (*Id*. at 6:22-7:15.)  The three men reached the front desk at approximately 9:44 a.m. where Ellington signed the visitor's log and received a visitor's badge.  (Tr. 42:14-44:22; Govt. Ex. 1.)  The agents then escorted Ellington upstairs where he was allowed to use the restroom, accompanied by Agent Dillon, before being taken to a conference room on the third floor of the building.  (GWE Tr. 7:13-8:7; Tr. 45:10-22.)

---

[1] Two separate transcripts were issued for the evidentiary hearing.  One of the transcripts contains only Ellington's testimony.  The other transcript contains the testimony of Agent Horan and Sergeant Toquica, as well as discussions on the record between counsel and the Court.  The transcript containing only Ellington's testimony will be cited as "GWE Tr."  The other will simply be cited as "Tr."

Once inside the conference room, the agents asked Ellington to take a seat at the table across from them.  (GWE Tr. 8:8-19.)  Almost immediately, Agent Dillon revealed to Ellington that he had been brought to the FBI office under a "ruse."  (Tr. 45:21-46:2; GWE Tr. 9:4-14.) Agent Dillon told Ellington that he was in a "substantial amount of trouble" and that he was not there to discuss potential participation in a federal gang task force, but because he had been indicted by a grand jury on federal criminal charges.  (GWE Tr. 9:4-14.)  Agent Dillon advised Ellington to "be quiet and not say anything."  (GWE Tr. 9:11-21; Tr. 103:8-15.)  Ellington complied with Agent Dillon's request.  (GWE Tr. 9:19-23.)  The agents then handed Ellington a copy of the sealed indictment returned against him on October 14, 2010 and instructed him to read it.  (Tr. 48:2-6.)

After Ellington finished reading the indictment, the agents presented him with a large board entitled "Federal Sealed Indictment," which was placed on an easel near the conference room table.  (Tr. 49:3-50:7; 53:25-54:3.)  The oversized board summarized the two extortion counts contained in the federal sealed indictment, as well as the maximum statutory penalty under 18 U.S.C. § 1951(a) of up to twenty (20) years confinement, and an estimate of the Federal Sentencing Guidelines range of 188-235 months imprisonment (15 ½ - 19 ½ years).  (Gov. Ex. 4-1.)  Agent Dillon explained to Ellington that the Federal Sentencing Guidelines figure displayed on the board represented the potential sentence a judge may impose if he were convicted of the charges.  (Tr. 50:8-51:13.)  At some point after the agents presented the first board, Ellington testified that he tried to speak.  (GWE Tr. 10:7-18.)  Agent Dillon said, "Wait, don't say anything.  Just listen to what I have to tell you."  (*Id*.)  Ellington claims that he was attempting to ask for an attorney when he was admonished not to say anything.  (*Id*. at 10:22-24.) Thereafter, Ellington remained silent until he was instructed to speak.  (*Id*. at 10:19-21.)

The agents next presented Ellington with a second board entitled "Potential Superseding Indictment." (Tr. 52:19-53:10; Govt. Ex. 4-2.) In addition to the two extortion counts charged in the sealed indictment already filed against Ellington, the board reflected four additional crimes for which the agents explained Ellington had not yet been, but could be, indicted. (Tr. 52:2-7; Govt. Ex. 4-2.) The board displayed two counts of "Aiding & Abetting the Attempted Possession with Intent to Distribute Ecstasy" and two counts of "Carrying & Possession of a Firearm During and in Relation to a Drug Trafficking Offense." (Govt. Ex. 4-2.) For each of the four additional counts, the board showed the statutory sentence maximum. (*Id.*) The board also reflected the fact that "Carrying & Possession of a Firearm During and in Relation to a Drug Trafficking Offense" carries a mandatory minimum sentence of five (5) years consecutive for the first offense and twenty-five (25) years consecutive for the second offense. (*Id.*) A potential charge of "Aiding & Abetting the Attempted Possession with Intent to Distribute Ecstasy" against Ellington's wife, Tania Katrisse Ellington ("Mrs. Ellington" or "Ellington's wife"), also appeared on the board. (*Id.*) While the rest of the writing appeared in black type of a uniform size, Mrs. Ellington's name was displayed next to the potential charge in larger red lettering. (*Id.*) Ellington testified that the board bearing his wife's name and the potential charge "hit [him] pretty hard." (GWE Tr. 11:3-6.)

The next set of boards the agents showed Ellington contained Federal Sentencing Guidelines estimates for the potential superseding indictment charges against both Ellington and his wife. (Govt. Exs. 4-3 & 4-4.) The 188-235 month estimated sentence range for the charges already indicted against Ellington was reiterated on the top half of the first board. (Govt. Ex. 4-3.). Directly below that, the word "PLUS" appeared in larger red lettering. (*Id.*) Immediately beneath the word "PLUS," the following appeared: "<u>Mandatory</u> 30 years Consecutive" and

"Total Potential Confinement" of "45 ½ to 49 ½ years incarceration." (*Id.*) While showing the board, the agents explained that, if the superseding indictment were filed, Ellington would face a mandatory thirty (30) year sentence in addition to the potential 188-235 month sentence for the already indicted charges. (Tr. 54:6-55:1.) The second board revealed the Federal Sentencing Guidelines estimate for the charge against Ellington's wife in the potential superseding indictment, which was listed as 121-151 months or "10+ - 12 ½ years" imprisonment. (Gov. Ex. 4-4.) The agents also orally explained to Ellington that the sentence reflected was the potential punishment his wife could face if convicted of the charge in the potential superseding indictment. (Tr. 55:9-21.) Throughout the presentation of the boards, the agents communicated to Ellington that the "additional crimes could be added against him" and against his wife "if he failed or decided to refuse the government's offer." (Tr. 52:2-22.)

The agents then began to show Ellington some of the government's evidence against him. (*Id.* at 55:22-56:3.) Two video clips, which purported to reveal Ellington's involvement in two drug trafficking incidents, one on February 22, 2010 and the other on April 22, 2010, were played for him on a screen in the conference room. (*Id.*) According to Agent Horan, the agents showed Ellington the video clips in order to demonstrate that they possessed evidence against him for the crimes charged. (*Id.* at 56:2-5.) This information, Agent Horan explained, was intended to assist Ellington in evaluating his options. (*Id.* 56:6-8.) Next, the agents played an audio clip, which they told Ellington was a recording of his wife arranging a drug transaction over the phone on February 5, 2010. (*Id.* at 60:25-62:23.) Following the audio clip, Ellington claims that he asked for the recording to be played again because he did not believe it contained his wife's voice. (GWE Tr. 11:13-12:7.) According to Ellington, the agents responded that, if Ellington wanted to play games, the interview would not go very well. (*Id.* at 12:8-10.) By this

point in the interview, Ellington testified that he believed he was crying.  (*Id*. 12:11-14.)

After the agents completed their presentation, Agent Dillon read aloud to Ellington the text of the FBI's Advice of Rights form FD-395.  (Tr. 62:24-63:24.)  Agent Horan then provided Ellington with a copy of the same form, which Ellington reviewed and signed at 10:04 a.m.  (*Id*.; Gov. Ex. 8.)  Ellington also responded orally in the affirmative that he understood his rights.  (Tr. 63:19-24.)

Shortly thereafter, Agent Dillon explained to Ellington what his "options were . . . at that point."  (GWE Tr. 12:25-13:5.)  According to Ellington, the first thing Agent Dillon told him was that Ellington "could get an attorney and then explained if [he] decided not to get an attorney [he] could cooperate."  (*Id*. at 13:6-10.)  Ellington testified that Agent Dillon was "dismissive" of the option of getting an attorney.  When prompted to explain why he described Agent Dillon as dismissive, Ellington testified that Agent Dillon said, "'Well, you can get an attorney or'-- and then he went on to other things."  (*Id*. at 13:25-14:1.)  When asked about the other things "he went on to," Ellington stated:  "That -- well, I wouldn't have -- you know, I could cooperate and wouldn't have charges -- additional charges – I knew the two that they were already talking about but no additional charges; my wife wouldn't go to jail; I would be able to keep my job and, in his words, carry a gun."  (*Id*. at 14:1-7.)  The agents were aware at the time they presented Ellington with these options that Ellington and his wife were raising four children together and that Ellington had been experiencing serious financial difficulties.  (GWE Tr. 14:8-12; Tr. 109:5-13.)

The agents then informed Ellington that Assistant United States Attorney Daniel Rodriguez ("AUSA Rodriguez") was in the building and available to speak to him.  (Tr. 66:1-4.)  After being told that AUSA Rodriguez could "help [him] out," Ellington asked to speak to him.

(GWE Tr. 14:18-24.)   According to Ellington, AUSA Rodriguez came into the room and told Ellington, "I'll never be your friend, but I can be your worst enemy."   (GWE Tr. 15:20-16:1.) Ellington testified that he "inferred" what AUSA Rodriguez meant by that statement as the "conversation went on."   (*Id.* at 16:2-5.)   AUSA Rodriguez proceeded to repeat the charges Ellington was currently facing and those he would face in the event of a superseding indictment. (Tr. 66:16-20.)   According to Ellington, AUSA Rodriguez "explained that with my cooperations -- or cooperation, I would be able to save myself from going to jail that day, keep my job, my wife wouldn't go to jail, and I believe that it was his words, 'a media circus wouldn't be made out of this,' my family -- you know, in reference to my family not knowing anything, the charges would not be stacked." (GWE Tr. 16:10-17.)   Ellington also testified to the following regarding AUSA Rodriguez's remarks to him:

> Q. When you were told that you had the right to an attorney, was -- were things said or in the manner in which they were told or communicated to you make you believe that that was not your best choice?
>
> A. Yes, sir.
>
> Q. And who are the individuals that communicated that to you either by words or demeanor?
>
> A. Agent Dillon. Well, I take that back. Mr. Rodriguez had made a statement that led me to believe that, as well.
>
> Q. And what was his specific statement, if you recall?
>
> A. That if I retained counsel, pled not guilty, took the case to trial that he would stack additional charges, superseding indictments, put my wife in jail, make a media circus of the whole situation and that the next time he saw me it would be in front of a magistrate.[2]

(*Id.* at 60:19-61:8.)   During the approximately five minutes in which AUSA Rodriguez was in the conference room, he also informed Ellington of his definition of the "substantial assistance"

---

[2] Presumably, AUSA Rodriguez was referring to Ellington's initial appearance before a United States Magistrate Judge.

Ellington would need to provide in order to prevent the charges in the potential superseding indictment.  (GWE Tr. 16:16-17; Tr. 67:13-15.)   The precise parameters of "substantial assistance" that AUSA Rodriguez communicated to Ellington are unclear from the record. Before AUSA Rodriguez left the conference room, Agent Horan testified that Ellington indicated that he wished to cooperate.  (Tr. 67:21-68:3.)  Ellington testified that, when AUSA Rodriguez left the room, he had not yet made a decision about what to do given the information he had received up until that point.  (GWE Tr. 17:19-23.)

After AUSA Rodriguez left the conference room, Sergeant Toquica from HCSD entered and the three officers began what they termed a "debriefing" to assess Ellington's ability to provide substantial assistance.  (Tr. 68:4-15.)   After roughly ten minutes of the debriefing, Ellington asked to speak with Sergeant Toquica privately.  (Tr. 137:12-138:8.)  Ellington testified that he was more comfortable dealing with Sergeant Toquica because he was acquainted with him professionally through HCSD.  (GWE Tr. 18:20-19:10.)  Ellington claims that he was afraid that he would provide the agents with information, but it might not be good enough, and he would face the maximum consequences anyway.  (*Id.* 18:23-19:4.)  Ellington claims that he shared privately with Sergeant Toquica information he possessed about an HCSD officer's involvement with illegal game rooms to determine whether Toquica thought it would be sufficient to meet the substantial assistance standard.  (*Id.* at 19:19-20:9.)   According to Ellington, Sergeant Toquica said, "'Hey, I think you got some good information. Let's run with it.'"  (*Id.* 19:23-24.)  Sergeant Toquica also allegedly reminded Ellington that he was in "damage control mode" and should do what he could to help himself.  (*Id.* at 20:16-20.)  Sergeant Toquica also reiterated to Ellington that this was his "last chance" to provide substantial information.  (Tr. 152:1-9.)  Believing Sergeant Toquica to be saying that his information could be "substantial,"

Ellington claims he agreed to talk to the agents about what he knew.  (GWE Tr. 20:21-21:2.)
Agents Dillon and Horan then came back in the room and Ellington told Agent Dillon that he
believed he had good information.  (GWE Tr. 21:3-4; 22:21-23.)[3]

According to Ellington, Agent Dillon responded that, prior to assessing his ability to
provide substantial assistance, Ellington first needed to make a "statement" about his
involvement in the crimes depicted in the video clips he was shown.  (Tr. 113:24-25; GWE Tr.
22:21-23:9.)  The agents confirm that they asked Ellington to make such a statement.  (Tr. 69:2-
5.)  Agent Horan explained that this statement was taken to "assess [Ellington's] truthfulness"
prior to allowing Ellington the opportunity to provide information about other corrupt law
enforcement officers.  (Tr. 69:6-10.)

Ellington complied with the agents' request and began to write out a statement in his own
handwriting on a lined sheet of paper.  (Tr. 69:11-12; Govt. Ex 9-1.)  The agents told Ellington to
write down the "who" "what" and "where" of the events underlying the crimes.  (*Id*. at 71:16-
22.)  Ellington testified that the officers also told him to include something about the fact that the
statement was made of his own "free will."  (GWE Tr. 23:5-11.)

As Ellington wrote the statement, he left a blank line between the end of his six sentence
description of the crime and his declaration that the statement was not coerced.  (GWE Tr. 23:16-
24:16; Govt. Ex. 9-1.)  Although the agents denied dictating to Ellington the contents of his

---

[3] Sergeant Toquica provided a somewhat different version of his private conversation with Ellington.  Toquica
claimed that Ellington did not express concern to him about what would happen if he was unable to provide
information the agents considered to be substantial.  (Tr. 146:11-15.)  Given Sergeant Toquica's hazy recollection of
the rest of the events of the day, the Court finds it odd that Sergeant Toquica testified with such certainty regarding
this fact.  Moreover, if Ellington did not ask to speak to Sergeant Toquica in order to express his fears, it is unclear
why Ellington would have requested to meet with him privately.  Sergeant Toquica testified that Ellington
mentioned the name of another officer on the HCSD force, but would not disclose any more information about that
officer's allegedly illegal activities because the HCSD officer would harm Ellington and his family.  (Tr. 146:16-
149:4.)  Sergeant Toquica's testimony regarding these events, however, was not credible.  Moreover, whether
Ellington possessed additional information regarding other possibly corrupt law enforcement officers that he chose
not to share with the agents is not particularly relevant to the key question of whether the agents engaged in coercive
tactics.

statement, Agent Horan admitted that after taking "the statement out . . . to be evaluated" and deciding that they wanted to "get a little bit more information," the agents told Ellington, "You need to be more specific [about] what you did."  (Tr. 72:15-20; 115:18-24.)  Ellington testified that the agents specifically told him to include something about the fact that he knew the transactions involved Ecstasy. (GWE Tr. 23:12-15.)   As instructed, Ellington went back and filled in the blank space to include the type and quantity of drugs involved in the transaction, as well as the fact that he checked license plates through "NCIC/TCIC."  (GWE Tr. 23:16-24; Govt. Ex. 9-1.)  Agent Horan testified that he remembered that Ellington went back and added a sentence after the agents instructed him to be more specific, but that he could not remember which one it was.  (Tr. 115:12-116:1.)   Ellington also testified that, as instructed by the agents, he wrote at the end of the statement: "I spoke with FBI Agents today to assist in this, my own, investigation and gave this statement in order to assist them without cohercion (sic)."  (Govt. Ex. 9-1.)

Ellington testified that he never would have given the incriminating statement if it were not required of him prior to being evaluated for his ability to provide "substantial assistance." He testified that he attempted to cooperate despite the uncertain benefits, in part, to avoid harm to his wife.  (GWE 34:9-11.)  Ellington also testified as follows:

> Q. But for the promises that were made to you regarding not filing other charges, potential leniency, working for them and keeping your wife out of trouble, would you have ever given the statement and cooperated?
>
> A. I know what I want to say. No. Emphatically.

(GWE Tr. 31:17-21.)

After completing his statement, Ellington was questioned by the agents and Sergeant Toquica about his knowledge of other potentially corrupt law enforcement officials.  (Tr. 73:6-

9.)  The agents testified that they explained to Ellington that they were looking for firsthand knowledge or individuals that Ellington could "contact and do consensual recordings on information that we [could] use as evidence in the prosecution of law enforcement officials at [Ellington's] level or higher."  (Tr. 73:14-20.)  During this "debriefing," Ellington provided information about a fellow deputy with HCSD who was involved with illegal game rooms.  (GWE Tr. 26:3-16; Tr. 123:5-12.)  AUSA Rodriguez then came back into the conference room to "assess" Ellington's information for its ability to provide "substantial assistance."  (Tr. 123:22-24.)  AUSA Rodriguez subsequently left the room again for a few minutes and then returned to tell Ellington that the information he provided was "no good."  (GWE Tr. 26:14-27:116.)  AUSA Rodriguez then said, "Take him to jail."  (*Id*. at 27:15-16.)  Ellington responded by saying, "What do you need me to do?"  (*Id*. at 27:21-25.)  According to Ellington, AUSA Rodriguez told him that he could call the HCSD deputy who was allegedly involved in illegal game rooms and order $10,000 worth of illegal games.  (*Id*. 28:2-8.)  Ellington told AUSA Rodriguez that he did not believe the illegal game request would be believable because everyone at HCSD knew Ellington was having financial problems.[4]  (*Id*. 28:6-10.)  After informing AUSA Rodriguez that it would be impractical to do as requested, AUSA Rodriguez allegedly responded, "Take his ass to jail."  (*Id*. 29:9-14.)  Ellington again asked what else he could do to assist them and AUSA Rodriguez told him there was nothing else he could do.  (*Id*. at 29:15-19.)  The debriefing lasted until approximately 1:00 p.m.  (Tr. 74:6-8.)  Ellington was then processed, fingerprinted, and photographed in relation to the charges contained in the sealed indictment and he was transported to the Federal Detention Center ("FDC") in Houston, Texas.  (Tr. 74:3-5; 75:16-23.)

During the time Ellington was in custody, he was given water and a package of cheese

---

[4] Ellington testified that he told the agents he would be willing to do as they requested, but that he could not do it at that very moment because everyone knew of his financial situation.  He stated that he would need time to put out the word that he had acquired money.  (GWE Tr. 31:1-16.)

crackers and permitted to use smokeless tobacco at his request.  (*Id.* at 68:16-20.)  At some point,

Ellington was offered, and he declined, a meal.  (*Id.* 68:23-69:1.)  He was also permitted to make

a phone call to provide for the safe transportation of his children from school.  (GWE Tr. 46:2-

6.)

On December 6, 2010, a superseding indictment was filed, which charged Ellington with

the four additional counts presented to him on the "Potential Superseding Indictment" poster

board during his interrogation on October 25, 2010.  (Doc. No. 28.)  The indictment also charged

Mrs. Ellington with one count of aiding, abetting, and assisting in the possession with the intent

to distribute a controlled substance, the same crime with which the agents and AUSA Rodriguez

threatened that she could be charged if Ellington failed to cooperate.  (*Id.*)

## II.    ANALYSIS

The admissibility of incriminating statements against an accused is governed by three

constitutional provisions: the Fifth Amendment privilege against compelled self-incrimination,

the Sixth Amendment, and the Due Process Clauses of the Fifth and Fourteenth Amendments.

Under  appropriate  circumstances,  these  provisions  may  provide  for  the  suppression  of  a

defendant's incriminating statements made to law enforcement officials or their agents.  In this

case,  two  of  the  legal  doctrines  authorizing  suppression  derived  from  these  constitutional

provisions are plainly inapplicable to the facts presented.  Indeed, although Ellington was in

custody on October 25, 2010, Special Agents Horan and Dillon unquestionably informed

Ellington of his *Miranda* rights and he executed a waiver form.  *See Miranda v. Arizona*, 384

U.S. 436, 444 (1966).  Thus, Ellington's statement cannot be suppressed on the basis that it was

unwarned.[5]  Additionally, although Ellington's Sixth Amendment right to counsel attached when

---

[5] Although the *Miranda* warnings were properly recited, the question remains whether Ellington's waiver of his
rights was knowing, intelligent, and voluntary.  Courts have tended not to draw clear distinctions between whether

he was indicted, on the day of his government-initiated interrogation, he had not yet, at any point, invoked that right, and therefore, he is not entitled to the presumption that his waiver was invalid. *See Montejo v. Louisiana*, ---- U.S. ----, 129 S.Ct. 2079, 2086, 173 L.Ed.2d 955 (2009) (when defendant makes no "initial election" to exercise the right to counsel there is no need for a prophylactic rule against later waivers).  Ellington concedes that his *Miranda* warnings were administered and that he is not entitled to the presumption that the waiver of his Sixth Amendment right to counsel was invalid.  He argues, rather, that his statement should be suppressed because it was not given voluntarily.  Ellington contends that the statement was coerced by the manipulation and psychological pressure employed by FBI Agents Horan and Dillon, HCSD Sergeant Toquica, and Assistant United States Attorney Daniel Rodriguez.

The Court agrees that Ellington's will was overborne by a combination of threats of drastically increased punishment, an attractive illusory promise, and a misleading and coercive ultimatum regarding the exercise of his constitutional rights.  The Court also finds that Ellington did not voluntarily waive his constitutional rights under the distinct, but significantly overlapping Fifth Amendment *Miranda* doctrine.  The Court will first review the voluntariness standard and then explain the law enforcement conduct that caused Ellington to make an involuntary statement, which is inadmissible against him under the Due Process Clause.  Next, the Court will analyze how the law enforcement officers' conduct also violated Ellington's Fifth Amendment privilege against compelled self-incrimination by rendering his *Miranda* waiver involuntary.

### A.       The Voluntariness Standard

"[O]urs is an accusatorial and not an inquisitorial system-a system in which the State

---

the matter at issue is the effectiveness of a defendant's waiver of his constitutional rights, on the one hand, or the more general voluntariness of the defendant's statement on the other. *See* McCormick On Evid. § 155 (6th ed.). The Court will therefore analyze the issue of the admissibility of Ellington's statement applying cases discussing both doctrines.

must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *Rogers v. Richmond*, 365 U.S. 534, 541 (1961). "'[I]n cases involving involuntary confessions, [the Supreme Court] enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (citing *Blackburn v. Alabama*, 361 U.S. 199, 206-207 (1960)).

These deeply held values are embodied in and safeguarded by the Due Process Clause and the voluntariness doctrine derived from it, which provide for the suppression of involuntary statements extracted through coercive government conduct. *See Colorado v. Connelly*, 479 U.S. 157, 165 (1986). Indeed, if offered against an accused at trial "[a] confession cannot be the product of official overreaching in the form of either direct or subtle psychological persuasion." *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996) (citing *United States v. Scurlock*, 52 F.3d 531, 536 (5th Cir. 1995)). On the other hand, "[a] confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Id*. at 1033.

The due process voluntariness test calls for an examination of "'whether a defendant's will was overborne' by the circumstances surrounding the giving of [an incriminating statement]." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Bustamonte*, 412 U.S. at 226). "The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and details of the interrogation.'" *Id*. "The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Id*. "[A] defendant may establish that the

confession was involuntary by demonstrating that a link exists between his confession and coercive police conduct." *United States v. Gomez*, No. EP-07-CR-1231-DB(3), 2007 WL 3118297, at *2 (W.D. Tex. Oct. 18, 2007) (citing *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004)). However, "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." *Connelly*, 479 U.S. at 164 n.2 (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)).

The voluntariness determination is a question of law which turns upon the facts of each case. *See United States v. Posada-Rios*, 158 F.3d 832, 866 (5th Cir. 1998). Indeed, "[d]etermining whether a confession is voluntary requires an assessment of human motivation and behavior. One factor, by itself, is seldom determinative." *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978). "The Government has the burden of proving, by a preponderance of the evidence, that a defendant voluntarily waived his rights and that his statements were made voluntarily." *United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999), *cert. denied*, 528 U.S. 990 (1999) (citing *United States v. Restrepo*, 994 F.2d 173, 183 (5th Cir.1993)).

### 1. Conduct of Law Enforcement

In this case, the coercive conduct of the law enforcement officials that participated in planning and executing Ellington's interrogation is the critical factor that leads the Court to conclude that Ellington's statement was involuntary. Indeed, the Court is deeply troubled by the course of official conduct that ultimately caused Ellington to waive his rights and make an incriminating statement. The agents employed threats of significantly greater punishment for Ellington and his wife and made illusory promises of leniency if Ellington "cooperated." They then made Ellington's sole opportunity to cooperate contingent upon his willingness to waive his

right to counsel and incriminate himself.  When considered together, as they were intended to be, these pressures were plainly coercive and, ultimately, caused Ellington to make a statement that was not the product of his free and rational choice.

### a.   The Use of Threats and Promises

In *Bram v. United States*, the Supreme Court held that "a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied  promises, however slight, nor by the exertion of any improper influence." 168 U.S. 532, 542-543 (1897).  "The Court, however, has retreated from a strict application of this position, holding that *Bram* does not state the standard for voluntariness."  *United States v. Fernandes*, 285 Fed.Appx. 119, 124 (5th Cir. 2008) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-286 (1991)).  Rather, in *Arizona v. Fulminante*, approving of the state court's analysis, the Supreme Court stressed that the modern voluntariness test requires examination of the totality of the circumstances.  *Id*. at 286-287.  "In that regard, the existence of a promise constitutes but one factor in that determination and does *not* render a confession involuntary *per se*."  *Fernandes*, 285 Fed.Appx. at 124 (citing *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988)).  In keeping with the Supreme Court's direction, "courts have indicated that to determine voluntariness it is necessary to look at the totality of the circumstances, *including* any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne."  *United States. v. Jackson*, 918 F.2d 236, 242 (1st Cir. 1990) (citing *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1990)).  In order to render a confession involuntary, the role of a promise or threat must have been "sufficiently compelling to overbear the suspect's will in light of all attendant circumstances."  *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988); *see also United States v. Baldwin*, 60

F.3d 363, 365 (7th Cir. 1995), *abrogated on other grounds sub nom United States v. D.F.*, 115 F.3d 413 (1997) (after *Fulminante*, key is whether interrogator resorted to tactics that under the circumstances "prevented the suspect from making a rational decision whether to confess or otherwise inculpate himself").

Because threats and promises must be viewed as part of the totality of the circumstances on a case-by-case basis, appellate courts have been unable to define precise parameters to guide lower courts. Courts have attempted, however, to delineate what conduct is generally insufficient, absent other compelling facts, to render a subsequent incriminating statement involuntary, and have articulated when, under appropriate circumstances, official conduct may prove unduly coercive.

Relevant to the facts of this case, the Fifth Circuit has stated that "a promise of leniency or threat of additional prosecutions may constitute psychological coercion." *Harris v. Beto*, 367 F.2d 567, 568 (5th Cir. 1966). Certainly, "'a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary.'" *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992) (citing *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987)). Similarly, the Sixth Circuit has found that "[p]olice promises of leniency and threats of prosecution can be objectively coercive." *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003). More specifically, the Ninth Circuit has held that it may be unduly coercive for law enforcement to threaten to convey a suspect's lack of cooperation to the prosecutor. *See United States v. Tingle*, 658 F.2d 1332, 1336 n.5 (9th Cir. 1981); *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994). The *Tingle* Court reasoned that:

> [r]efusal to cooperate is every defendant's right under the fifth amendment.
> Under our adversary system of criminal justice, a defendant may not be made to
> suffer for his silence. Because there is no legitimate purpose for the statement that
> failure to cooperate will be reported and because its only apparent objective is to

coerce, we disapprove the making of such representations.

In attempting to define a floor for conduct that generally does not render a confession constitutionally suspect, courts have held that, merely representing that officers will "make a defendant's cooperation known to the prosecutor," is not coercive.  *See, e.g.*, *United States v. Shears*, 762 F.2d 397, 401-402 (4th Cir. 1985)).  Similarly, the Fifth Circuit has held that "advising [the] accused that there are advantages to cooperating does not render [a] confession involuntary."  *Broussard*, 80 F.3d at 1035 (citing *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1348 (5th Cir. 1994)).[6]  The Fifth Circuit has also held that "[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will.  Such an account may increase the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made."  *Ballard*, 586 F.2d at 1063.

This Court does not disagree with the relatively well-settled proposition that merely explaining the advantages of cooperation and/or relating the possible penalties does not render a subsequent confession involuntary.  The agents' conduct in this case, however, went far beyond providing a non-coercive assessment of Ellington's options and amounted to intense

---

[6] The Government cites *Ornelas-Rodriguez* for the proposition that "[c]ourts generally have . . . held that promises of leniency are insufficiently coercive to constitute a Fifth Amendment violation."  (Govt. Resp. at 9.)  The weight of authority, however, indicates that threats of prosecution and/or promises of leniency may prove unduly coercive under appropriate circumstances.  In *Ornelas-Rodriguez*, the Court did not give guidance as to the circumstances under which government conduct crosses the threshold from merely explaining cooperation's benefits to creating a coercive inducement.  Indeed, the defendant in that case testified that he had been threatened with violence during his interrogation and frightened by the brutal treatment of his co-conspirator during their arrest.  *Ornelas-Rodriguez*, 12 F.3d at 1347.  The district court did not find *Ornelas-Rodriguez*'s testimony credible regarding the alleged threats of violence, and partially on that basis, it denied the motion to suppress.  In denying the motion, the district court also noted that the "DEA officers . . . probably pointed out to the defendant the advantages of cooperation. That does not remove free will."  *Id*. at 1348.  The Fifth Circuit affirmed the district court, finding that its "decision to choose the credibility of [the DEA officer] was not clearly erroneous."  *Id*.  The Fifth Circuit, however, did not address the issue of whether promises of leniency that go beyond merely explaining the benefits of cooperation may be sufficiently coercive under certain circumstances.

psychological pressure.  Indeed, the law enforcement officials executed a well-thought out and rehearsed plan, which was devised over the course of several inter-agency strategy meetings apparently in order to induce Ellington to incriminate himself and plead guilty to the original sealed indictment.  The FBI, HCSD, and AUSA concocted the scheme to trick Ellington into reporting to the FBI headquarters without counsel, under the pretext that he was being considered for a federal task force position for which he had applied.  Although Ellington's Sixth Amendment right to counsel attached upon indictment, Ellington did not know he had been indicted and therefore had not yet had an opportunity to invoke his right to counsel prior to the October 25, 2010 interrogation.  Presumably, the agents, advised by AUSA Rodriguez, were aware that, given Ellington's lack of prior opportunity to invoke the right to counsel, if they succeeded in convincing Ellington to talk, he could waive both his Fifth and Sixth Amendment rights without triggering the presumption that the waiver was invalid.

As designed, upon Ellington's arrival, the agents immediately ambushed him with the sealed indictment against him.  While he was still reeling from that information, the agents presented four large poster boards, the first of which displayed Ellington's exposure for the already indicted crimes.  The next three boards displayed the additional charges that could be brought against him (including an accompanying thirty year mandatory minimum sentence) if he refused to cooperate.  The clear implication was that those charges would be brought if Ellington refused to accept the agents' offer to provide substantial assistance.  The name of Ellington's wife appeared on one of the boards in enlarged red lettering, conveying to Ellington the unmistakable threat that she would be prosecuted also if Ellington chose not to waive his rights and talk to the agents.  These large poster boards were prepared in advance of the interrogation for the obvious purpose of supplying maximum psychological impact.  The coercive influence of

the posters is evidenced by their large size and the fact that they emphasized certain facts, such as Ellington's wife's name and the mandatory nature of the thirty-year sentence, in larger red type.  The agents knew when they made the threats of additional charges that Ellington and his wife were raising four children together.  Indeed, they imagined that Ellington's wife going to prison would have an impact on those children and, presumably, understood that the thought of his wife going to prison would have a tremendous influence on Ellington's mental state.  The law enforcement officers took great care in their testimony to avoid characterizing the charges contained in the "potential superseding indictment" as threats, but that is precisely what they were.

The United States Attorney's Office initially chose to indict Ellington on only two extortion charges, allegedly in order to give him an "opportunity" to "cooperate."  Although the government agencies involved in making the decisions related to Ellington's interrogation may have been sincere in their desire to secure information about corrupt law enforcement officials, they appear to have been far more concerned with obtaining an incriminating statement from Ellington, which they extracted by threatening him with a thirty-year mandatory minimum sentence.  Indeed, they made his opportunity to provide "substantial assistance" contingent upon his giving an incriminating statement about his involvement in the drug trafficking scheme. Ellington could have easily told the agents what he knew about other allegedly corrupt law enforcement officials without writing a statement implicating himself and his wife in the crimes for which he had been indicted.  Agent Horan's explanation that requiring the statement was intended to allow the agents to "assess" Ellington's "truthfulness" is simply not credible.  The manner in which the agents went about obtaining the statement supports the conclusion that their actions were calculated to compel Ellington to provide an incriminating statement that could be

20

used in his prosecution.  The agents made Ellington aware of the harsh consequences of his failure to cooperate.  They then informed him that, in order to have even the "opportunity" to save himself from extraordinary punishment, he must provide "substantial assistance" in the investigation of corrupt law enforcement officials, and in particular, must first write out an incriminating statement.  The agents subsequently directed Ellington to include certain information about the type and quantity of drugs involved in the transaction for which Ellington allegedly provided assistance.  These instructions belie the agents' explanation and suggest that, in reality, they sought an incriminating statement to aid in Ellington's prosecution.  Moreover, given that Ellington had just been presented with two video clips showing him exactly what evidence the government possessed, it strikes the Court as quite unusual that Ellington would need to recount those events in order to demonstrate that he would provide truthful information about unrelated dealings with corrupt law enforcement officers.  The Court credits Ellington's testimony that the agents instructed him to write that his statement was not coerced and, therefore, does not find that it has significant probative value in determining whether Ellington's will was overborne.

In sum, both the agents and AUSA Rodriguez told Ellington that he was being presented with his sole opportunity to cooperate.  If he chose not to give a statement during the interrogation, the charges against him and his wife would be "stacked."  Indeed, the agents and AUSA Rodriguez threatened Ellington with the prospect of extreme consequences if he refused to provide an incriminating statement, while at the same time made an illusory promise that, if he gave an incriminating statement and was able to provide substantial assistance, he could avoid the maximum consequences, avoid going to jail that day, continue receiving a pay check for some period of time, and keep his wife out of prison.  "In many ways, both types of statements

are simply different sides of the same coin: 'waive your rights and receive more favorable treatment' versus 'exercise your rights and receive less favorable treatment.'" *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994).   Viewed either way, the agents formulated an extraordinarily frightening threat coupled with an attractive inducement, making it "apparent that the prosecutor and police went to extraordinary lengths to extract from [Ellington] a confession by psychological means."  *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977).

Ellington appears to argue that the law enforcement officials' threat to prosecute his wife, standing alone, is sufficient to render his statement involuntary.  Indeed, in the past, the Supreme Court found that that certain threats can have a sufficiently compelling impact absent specific circumstances suggesting otherwise.  *Rogers v. Richmond*, for example, held that the defendant's confession was coerced where it was obtained in response to a police threat to take defendant's wife into custody.  365 U.S. 534 (1961).[7]  In *Streetman v. Lynaugh*, the Fifth Circuit recognized *Rogers*' holding, noting that "police threats to an accused or his family render a resulting confession involuntary."  812 F.2d at 957.  Despite the seemingly broad pronouncement that threats to an accused's family members render a subsequent confession involuntary, the Fifth Circuit has, in practice, limited the circumstances under which, standing alone, such a threat may be considered unduly coercive.  In *Allen v. McCotter*, the Fifth Circuit held that "Based on [the] objective facts known by [the detective] at the time of the interrogation, [the detective] had probable cause to arrest the petitioner's wife for aiding in the commission of the robbery. The petitioner's confession was therefore not involuntary . . . ."  804 F.2d 1362, 1364 (5th Cir. 1986.) The Seventh Circuit has also held that a "threat to arrest or hold a suspect's paramour, spouse, or relative *without probable cause* could be the sort of overbearing conduct that society discourages

---

[7] *Rogers* was decided long before the Supreme Court in *Arizona v. Fulminante* explicitly stated that threats were to be evaluated as part of the totality of the circumstances and, thus, today, the threat to the defendant's wife in *Rogers* may have been insufficient by itself to render his confession involuntary.

by excluding the resultant statements." *United States. v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006), *abrogated on other grounds*, *Kimbrough v. United States*, 552 U.S. 85 (2007) (emphasis added) (citing *Lynumn v. Illinois*, 372 U.S. 528 (1963)).   The *Miller* court held that, notwithstanding the *Rogers*' Court's prohibition against such unwarranted threats, "a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from taking hostages," and is not unduly coercive.  *Id*.  The Seventh Circuit has read *Rogers* to proscribe only threats against family members, like the defendant's wife in *Rogers*, for whom the authorities lack probable cause to arrest or charge.  Similarly, the Sixth Circuit has held that "the question whether the threat to prosecute [defendant's half-sister] was coercive turns on the issue of whether the threat could have been lawfully executed. Whether the police could have lawfully arrested [defendant's half-sister] in turn depends on whether the investigating officers had probable cause to suspect [her] of criminal involvement." *Johnson*, 351 F.3d at 263.

In this case, the agents threatened Ellington that his only opportunity to prevent the indictment of his wife was by cooperating with them.  The agents played Ellington an audio clip, allegedly capturing Mrs. Ellington arranging a drug transaction involving methamphetamine. Agent Horan admitted at trial that the transaction proposed in the audio clip never actually took place.  The agents and AUSA Rodriguez, however, did not threaten to indict Mrs. Ellington for distribution of methamphetamine, but for "Aiding & Abetting the Attempted Possession with Intent to Distribute Ecstasy."   Although they did not share it with Ellington during his interrogation, it appears that the government indeed possessed evidence demonstrating that Mrs. Ellington's was also involved in the Ecstasy transaction for which she was later indicted. Specifically, Agent Horan testified that, during a recorded conversation with Ellington and a

confidential informant "(CI")", Mrs. Ellington told the CI that the money he paid Mr. Ellington

"really saved their lives."  (Tr. 33:24-34:1.)  A few weeks later, Agent Horan testified, the agents

recorded a phone call between Mrs. Ellington and the CI in which Mrs. Ellington advised the CI

that, "if there's another opportunity to do another drug transaction we would like to cooperate,

participate in it."  (*Id*. at 34:5-10.)  Mrs. Ellington allegedly initiated this phone call.  (*Id*.)  Based

on the evidence in the record, it does appear that the government possessed at least some

evidence that Mrs. Ellington had committed the crime for which she was later indicted.  Under

Fifth Circuit precedent, therefore, the agents' threats to indict Mrs. Ellington do not themselves

render Ellington's statement involuntary.

### b.  Choice Between Attorney and Cooperating

Although the threat to Ellington's wife, standing alone, would not render his confession

involuntary, the Court remains troubled by the combination of the agents' threats of significantly

increased penalties against Ellington and his wife, with its illusory promises of leniency and the

strong suggestion that, by invoking his constitutional rights, Ellington would trigger the full

range of charges.  The most disquieting aspect of the official conduct in this case is the way in

which the law enforcement officials presented Ellington's options vis-à-vis his right to counsel.

Both AUSA Rodriguez and Officer Dillon suggested to Ellington that he must incriminate

himself during the October 25, 2010 interrogation *without the assistance of counsel* or forever

forfeit the chance to cooperate and potentially avoid the threatened additional charges.  Indeed,

they explicitly told Ellington that his "opportunity" to "help himself" to avoid a thirty-year

mandatory minimum sentence and the prosecution of his wife was contingent upon his

willingness to waive his constitutional rights to counsel and to remain silent.  They suggested

that, if Ellington chose not to talk and to get an attorney, he would face harsher penalties, to the

tune of a potential additional combined forty years in prison for him and his wife.  Indeed, in addition to threatening additional charges against Ellington and his wife and promising Ellington that he would have a chance to avoid those charges if he cooperated and could provide substantial assistance, the agents presented Ellington with "a misleading 'now or never' ultimatum."  *United States v. Brooks*, 838 F.Supp. 58, 63 (W.D.N.Y. 1993).  Indeed, the agents and AUSA Rodriguez forced Ellington to "choose between having an attorney present during questioning, or cooperating with the government."  *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citations omitted) (holding that the agent's statement suggesting that speaking with a lawyer would preclude the defendant from cooperating with police rendered the defendant's confession involuntary).

Specifically, Agent Dillon informed Ellington that he "could get an attorney," but then, in the same breath, explained that *if* Ellington "decided not to get an attorney" then he could "cooperate."  Ellington testified to the following regarding AUSA Rodriguez's statements during the interrogation: "[I]f I retain counsel, pled not guilty, took the case to trial that [AUSA Rodriguez] would stack additional charges, superseding indictments, put wife in jail, make a media circus of the whole situation and that the next time he saw me it would be in front of a magistrate."  Later, the agents explicitly made Ellington's ability to "cooperate" contingent on his willingness to give an incriminating statement regarding his involvement in the criminal activity depicted in the video clips played that morning.  The message of these two statements was unmistakable to Ellington.  He would forfeit forever the opportunity to cooperate, and thus, the potential to prevent the additional charges from being "stacked" against him and his wife if he requested an attorney.  In order to hold onto any hope of avoiding the threatened charges, Ellington was forced to make an incriminating statement without the ability to consult with an

attorney.  The agent's statements appear "to have created in [Ellington's] mind a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the . . . agents."  *Id*.  Indeed, although the agents informed Ellington of his right to counsel—a right of which he was undoubtedly already aware before the interrogation—they indicated that the exercise of that right would be prejudicial by denying him altogether the opportunity to cooperate and thereby avoid the threatened additional charges.  This framing produces serious constitutional issues.  Indeed "[w]here . . . the police give the [*Miranda*] warnings but then suggest that the exercise of the right to consult with a lawyer would be prejudicial, denying the defendant all opportunities for leniency, that action not only will render involuntary the waiver of *Miranda* rights but also add a coercive element to the interrogation that could render the statement itself involuntary."  Wayne R. LaFave et al., Criminal Procedure 349 (5th ed. 2009).

In this case, the potential additional charges effectively represented the real possibility that Ellington would die in prison and that his wife would spend over a decade behind bars— leaving the couple's four children parentless.  The agents communicated to Ellington that his ability to avoid these incredibly harsh consequences for him and his family hinged upon his providing an incriminating statement without the ability to first consult an attorney.  The Second Circuit has held that such propositions can be unduly coercive, even absent other threats or promises, harsh interrogation conditions, or a particularly susceptible suspect.  Certainly, when viewed in their totality with the threats and promises made to Ellington, the actions of Agents Horan and Dillon, AUSA Rodriguez, and Sergeant Toquica plainly crossed the line between explaining benefits and providing information, on the one hand, and coercive conduct running afoul of the Constitution, on the other.  The agents and AUSA Rodriguez undeniably fashioned a

threat so terrifying and an inducement so attractive that Ellington's will was overborne.

### 2.   Conditions of Interrogation

As part of the totality of the circumstances, courts also examine the conditions under which the interrogation occurred.  In this case, the interrogation was held during the day in a large conference room at the regional FBI headquarters.  Ellington's custody lasted no more than five hours.  Throughout his time at the FBI office, he was offered water and a meal.  He was permitted to use smokeless tobacco and to make a phone call at his request.  It is clear that the physical conditions of the interrogation in this case do not add weight to the conclusion that Ellington's confession was involuntary.  Rather, as previously explained, it is law enforcement's psychological coercion that ultimately leads the Court to conclude that Ellington's will was overborne.

### 3.   Characteristics of the Defendant

The particular characteristics of a defendant are another factor courts consider in determining whether a statement was involuntarily given.  In this case, there is no question that Ellington is a relatively sophisticated defendant.  On October 25, 2010, Ellington was thirty-eight years old and had more than thirteen years of law enforcement experience.  Throughout his career, he had advised suspects of their *Miranda* rights between ten and twenty times.  Given his experience, the Court is not concerned that Ellington may not have understood his rights generally or that he was particularly susceptible to the agents' coercion.  By the same token, although Ellington had recited *Miranda* warnings multiple times, the evidence does not suggest that Ellington had any legal training, and the Court will not presume he possessed such knowledge.  Moreover, the official conduct in this case was apparently calculated to and, in fact, did overcome the will of a relatively well-informed defendant who was threatened and induced

to make a statement he would not have made otherwise.  That Ellington was a law enforcement officer, of course, also raises countervailing considerations.  Ellington no doubt could anticipate that a criminal case brought against him and/or his wife would attract far more negative publicity than the average prosecution, with attendant embarrassment for the entire family.  Likewise, a law enforcement officer might well expect greater danger from other prisoners while in custody.  Such considerations would necessarily have made Ellington, as a law enforcement officer, more unnerved than others by the strategy that was employed against him.

### B.      *Miranda* Waiver

There is much support in the Supreme Court's precedent for the proposition that suggesting to an accused that the exercise of his constitutional rights will result in harsher penalties is also impermissible under the Fifth Amendment's privilege against compelled self-incrimination.  Indeed, the agents' suggestion to that effect also raises the question of whether Ellington's waiver of his *Miranda* rights was truly voluntary.  The Fifth Amendment secures "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence."  *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).  Therefore "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  In addition, "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."  *Id*.  Indeed, "[t]he Supreme Court has stated that '[a]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show

that the defendant did not voluntarily waive his privilege.'"  *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003) (citing *Miranda*, 384 U.S. at 476).

Recently, in *Missouri v. Seibert*, the Supreme Court renounced "the conflicting objects" of *Miranda* and the question-first interrogation strategy that had then become ubiquitous.  542 U.S. 600, 611 (2004).  The Court reasoned that "*Miranda* addressed 'interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice' about speaking, and held that a suspect must be 'adequately and effectively' advised of the choice the Constitution guarantees.  The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed."  *Id.* (citations omitted).  "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires."  *Id.* at 611-612.  The Court ultimately determined that the strategy employed by law enforcement did not "effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture."  *Id.* at 612.

Like the question-first strategy employed in *Seibert*, the Court finds that, by making Ellington's only hope of cooperating and potentially saving himself and his wife from greater charges contingent on his waiver of his constitutional rights, the agents effectively removed his free choice.  Certainly, "by any objective measure" the agent's conduct in this case "reveals a police strategy adapted to undermine the *Miranda* warnings."  *Id.* at 616.  The now or never ultimatum the agents gave Ellington coupled with the threats of substantially greater punishment and an illusory promise to allow Ellington to "help himself" if he cooperated, eviscerated Ellington's ability to make a free and rational choice about whether to waive his *Miranda* rights and make a statement.  As explained above, when police give *Miranda* warnings, "but then

suggest that the exercise of the right to consult with a lawyer would be prejudicial, denying the defendant all opportunities for leniency, that action will . . . render involuntary the waiver of *Miranda* rights."   Wayne R. LaFave et al. at 349.

### III.    CONCLUSION

"[W]e must consider the cumulative effect of the statements made in order to determine whether [a defendant's] confession was voluntary."   *Tingle*, 658 F.2d at 1336 n.4. The facts surrounding Ellington's October 25, 2010 interrogation, when viewed together, demonstrate that the official tactics employed had an "impellingly coercive effect" on Ellington, which led him to give the statement in question.   *Lynumn*, 372 U.S. at 535.   The Court finds that, despite Ellington's status as a law enforcement officer, under the totality of the circumstances, his will was overborne by threats, illusory promises of leniency, and a now or never ultimatum regarding the waiver if his constitutional rights.   The Court finds that Ellington did not make a free and rational choice, but made the statement in a desperate attempt to save himself and his family from incredibly harsh punishment, an opportunity he was told would only be available without the aid of a lawyer and absent the ability to reflect on his options.   At the very minimum, the government has not established by a preponderance of the evidence that Ellington's written statement of October 25, 2010 was voluntary, and his motion to suppress is therefore **GRANTED**.

          **IT IS SO ORDERED**

          **SIGNED** at Houston, Texas, on this the 31st day of March, 2011.

                    _____
                    KEITH P. ELLISON
                    UNITED STATES DISTRICT JUDGE